**DSQ PROPERTY CO., LTD., Plaintiff,**

v.

**John Z. DeLOREAN, Defendant.**

**Civ. A. No. 89–CV–70304–DT.**

United States District Court,
E.D. Michigan, S.D.

Aug. 13, 1990.

---

John Altieri, Jr., Mudge, Rose Guthrie, Alexander & Ferdon, New York City, Merle R. Jenkins, Jenkins, Reebel & Zameck, Southfield, Mich. for plaintiff.

Mayer, Morganroth, Morganroth & Morganroth, Southfield, Mich., for defendant.

## OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION TO VACATE ATTACHMENTS AND INJUNCTIONS AND FOR AWARD OF DAMAGES

ROSEN, District Judge.

This matter is presently before the Court on the Defendant, John Z. DeLorean's ("DeLorean") Renewed Motion to Vacate Attachments and Injunctions and for Award of Damages. The Court heard arguments of counsel on August 8, 1990.

## I. FACTS

### A. PROCEDURAL BACKGROUND

Much of the background of this case was succinctly summarized by the Court of Appeals for the Sixth Circuit in its December 4, 1989 opinion in *DSQ Property Co., Ltd. v. DeLorean*, 891 F.2d 128 (6th Cir.1989):

John DeLorean appeals the district court's grant of summary judgment against him in his attempt to prevent the enforcement of a judgment rendered against him in the United Kingdom. John DeLorean argues that the district court erred in finding: (1) that he was personally and properly served with process; and (2) that his settlement with the Trustee of the DeLorean Motor Company did not bar recognition of the United Kingdom Judgment.

On October 12, 1987, the High Court of Justice, Chancery Division in London, England, awarded a default judgment of $54 million against John DeLorean to plaintiff, DSQ Property, Ltd., formerly DeLorean Motor Cars Ltd. On January 24, 1989, DSQ brought the instant diversity action in the United States District Court for the Southern District of New York to enforce the foreign country money judgment under New York law, N.Y. Civ.Proc.L. & R. Section 5301 *et seq.* (McKinney 1978). The district court of New York transferred venue to the Eastern District of Michigan under 28 U.S.C. Section 1404(a). Under section 1404(a), the applicable law is the law that would have applied in the Southern District of New York. *Van Dusen v. Barrack*, 376 U.S. 612, 636, 84 S.Ct. 805, 819, 11 L.Ed.2d 945 (1964).

The plaintiff, DSQ Properties Ltd. [sic], was created as the successor corporation to DeLorean Motor Cars Ltd., which went into receivership in Northern Ireland. DeLorean Motor Cars Ltd. manufactured the "DeLorean" automobile. These cars were distributed in the United States by the DeLorean Motor Company, which owned 75% of DeLorean Motor Cars Ltd. The DeLorean Motor Company was controlled by John DeLorean who owned 82% of the capital stock.

Both the United Kingdom judgment and the settlement with the bankruptcy trustee resolved claims arising out of agreements for the design of the "DeLorean" automobile. These agreements were entered by John DeLorean on behalf of DeLorean Motor Cars Ltd. and the DeLorean Motor Company with Colin Chapman, the Chairman of Lotus Cars Ltd. and owner of GPD Services, Inc. In these agreements, Chapman committed to undertake the design of the DeLorean automobile through his company, GPD Services, which was closely affiliated with Lotus. DeLorean and Chapman entered into a contract under which DeLorean Research Limited Partnership would provide GPD Services with an advance payment of $17,600,000. DeLorean Motor Cars Ltd. was to pay Lotus,

which would actually perform the engineering work, Lotus's actual out-of-pocket costs on an ongoing basis.

On October 25, 1982, DeLorean Motor Company filed for bankruptcy under Chapter 11 of the Bankruptcy Code, and the Unsecured Creditors' Committee of DeLorean Motor Company was created pursuant to 11 U.S.C. Section 1102(a)(1). DSQ Property was one of the largest creditors of DeLorean Motor Company and a leading member of the Unsecured Creditors' Committee. The Unsecured Creditors' Committee sued John DeLorean on behalf of the DeLorean Motor Company in Detroit and New York for diverting funds in the agreements with Lotus and GPD Services. Later, the bankruptcy proceeding was converted to a Chapter 7 proceeding, and the appointed trustee, David Allard, took over these suits. The suits were transferred to the Eastern District of Michigan for consolidation with the DeLorean Motor Company bankruptcy proceeding. On March 18, 1987, David Allard and John DeLorean entered into a stipulation whereby the parties agreed to submit to binding arbitration all the disputes and claims between them. The stipulation agreement provided in part that the scope of the arbitrator's jurisdiction and findings would not have any effect on claims and defenses of third-parties against the Trustee and/or John DeLorean. Before the suits went to arbitration, they were settled on May 28, 1987 in a stipulation approved by the district judge presiding over the bankruptcy litigation.

DSQ Property instituted suit against Lotus and its principals on January 28, 1986 based upon the various agreements for research and development for the manufacture of the "DeLorean" automobile. DSQ Property added John DeLorean as a defendant on July 24, 1987, alleging that he misappropriated funds from the [sic] DeLorean Motor Cars Ltd. under these agreements. John DeLorean failed to appear in the matter and a default judgment was entered in the London court.

After being transferred from New York, the district court held a hearing in Detroit on February 6 and 7, 1989 on the limited issue of effective service of process on the defendant John DeLorean in the United Kingdom action. The district court found as a matter of fact that John DeLorean had been properly served on August 30, 1987, and that the English court, therefore, did have jurisdiction when issuing the default judgment. John DeLorean filed a motion for reconsideration on the issue of effective service of process, but the district court denied his motion.

*Id.,* at 128–130.

To put the current motion in context, before the United States District Court for the Southern District of New York transferred venue in this case to this Court, on January 24, 1989 it entered an "Order to Show Cause, Ex Parte Temporary Restraining Order and Ex Parte Order of Attachment," which provided, in pertinent part:

... AND, FURTHER, it appearing to the Court that plaintiff will suffer immediate and irreparable injury if defendant is given the chance to sell, transfer, assign any interest in, dispose of, remove or in any way pledge, hypothecate or encumber his property before a hearing on plaintiff's motion for a preliminary injunction and to confirm an order of attachment can be had and it being shown that Plaintiff is entitled to an attachment against the property of defendant in the sum of $53,705,170.47 plus interest, costs, Sheriff's fees and expenses against the property of defendant, it is hereby:

ORDERED that the Sheriff of the City of New York levy within his jurisdiction, at any time before final judgment herein, upon any property in which defendant has an interest, including but not limited to JZD's [Defendant John DeLorean] shares of capital stock in 834 Fifth Avenue Corporation and the proprietary lease representing JZD's ownership of a cooperative apartment located at 834 Fifth Avenue in New York City, and upon those of its contents and furnish-

ings which are subject to enforcement of a money judgment, provided that both such levies shall be subject and subordinate to any and all interests in any of such property of David W. Allard, Jr., as Trustee of De Lorean Motor Company (the "Trustee") and further provided that the Sheriff shall refrain from taking any such property levied upon into actual custody pending further order of this Court; and upon such debts owing to the defendant as will satisfy plaintiff's claims herein; and

ORDERED that, pending the hearing and determination of this application or the expiration of ten (10) days from the date of entry hereof by the Clerk of this Court, whichever shall occur first, the defendant, his attorneys, agents and any others acting on his behalf or in concert with him are temporarily restrained pending further order of the Court from selling, transferring, assigning any interest in, disposing of, removing or in any way pledging, hypothecating or encumbering the properties previously set forth in this Order, except in favor of the Trustee upon notice to the plaintiff herein and except for sales or transfers of, assignments of interests in, dispositions of, removals of or pledges, hypothecations or encumbrances of, assets of Logan [Logan Manufacturing Company] made in the ordinary course of Logan's business to persons other than the defendant, his affiliates, attorneys, agents or any others acting in concert with him; and

ORDERED that defendant take all reasonable steps to prevent Logan from selling, transferring, assigning any interest in, disposing of, removing or in any way pledging, hypothecating or encumbering any assets of Logan except in favor of the Trustee upon notice to the plaintiff herein and except for sales or transfers of, assignments of interests in, dispositions of, removals of or pledges, hypothecations or encumbrances of, as-

sets of Logan made in the ordinary course of Logan's business to persons other than the defendant, his affiliates, attorneys, agents or any others acting on his behalf or in concert with him ...

(January 24, 1989 Order to Show Cause, etc., pp. 3–4).

On January 27, 1989, DeLorean appeared through his attorneys before the United States District Court for the Southern District of New York, seeking to vacate the temporary restraining order and order of attachment on the following grounds:

1. DeLorean was not personally served in the English action;

2. Comity: the district court action is in conflict with the final determination of the United States District Court for the Eastern District of Michigan, which has jurisdiction over the both Defendant De-Lorean and the Plaintiff, DSQ Property Co, Ltd. ("DSQ") with regard to the De-Lorean Motor Company bankruptcy adversary proceeding;[1]

3. The English action violates DeLorean's due process rights;[2]

4. The English action was barred by the statute of limitations; and

5. The plaintiff had not made an adequate showing that there is a likelihood that DeLorean would fraudulently transfer his assets.

(January 27, 1989 Transcript, pp. 7–9).

At the hearing, the New York district court ordered that venue be transferred to the United States District Court for the Eastern District of Michigan but that the January 24, 1989 Order stay in place pending the transfer. (January 27, 1989 Transcript, p. 36). The United States district judge signed an Order to the same effect on January 30, 1989. This Order, transferring the case and continuing the temporary restraining order and order of attachment, was docketed by this Court on January 31, 1989.

---

**1.** This issue has been pursued by DeLorean throughout these proceedings, but was ultimately resolved by the Sixth Circuit Court of Appeals in DSQ's favor. *DeLorean,* 891 F.2d, at 130.

**2.** This argument is based, in part, on DeLorean's assertion that, if he appeared in the United Kingdom to defend DSQ's action there, he would be arrested for crimes committed there.

In this Court, on February 3, 1989, Judge Julian A. Cook, acting for Judge Richard Suhrheinrich, signed an order that the January 24, 1989 temporary restraining order and order of attachment remain in effect until February 6, 1989 when the matter could be heard by Judge Suhrheinrich. On February 6, 1989, and February 7, 1989, Judge Suhrheinrich held a hearing on DSQ's motion for an order: 1) setting an early date for hearing on the pending applications for a preliminary injunction and to confirm the order of attachment; and 2) establishing an expedited briefing schedule for DSQ's motion for summary judgment.

At that hearing, Judge Suhrheinrich heard the testimony of witnesses and made a specific finding of fact that DeLorean had personally received service of process with regard to the United Kingdom action. (February 7, 1989 Transcript, pp. 116, 118). As a result of that hearing and DeLorean's consent to an extension of the temporary restraining order, Judge Suhrheinrich on February 10, 1989 entered his Order, stating:

> Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, IT IS HEREBY ORDERED that the temporary restraining order and order of attachment entered on January 24, 1989 by the Honorable Peter K. Leisure of the United States District Court for the Southern District of New York, and extended by this Court on January 3, 1989 [sic], is further extended pursuant to the consent of the parties and may be modified upon application.

(February 10, 1990 Order).

One week later, on February 17, 1989, DeLorean filed a "Cross–Motion and Opposition to Motion," essentially a motion to dismiss, and to vacate the orders of attachment and restraint. Also, on the same date, DeLorean filed a separate motion for reconsideration of Judge Suhrheinrich's determination that DeLorean had personally received service of process. In support of the motion to dismiss and to vacate the restraining order and attachments, DeLorean asserted the same grounds that had been argued before the district court in New York, and, in addition, argued that the restraining order prevented DeLorean from raising the funds necessary to pay Trustee Allard the approximately $4,000,000 needed for the bankruptcy settlement—notwithstanding the language in the original restraining order excepting transfers to the Trustee.

On February 28, 1989, Judge Suhrheinrich signed an Order amending the original temporary restraining order and order of attachment. The February 28, 1989 Order provides as follows:

> IT IS HEREBY ORDERED that the Order of Judge Leisure dated January 24, 1989, as previously amended, is further amended as set forth herein;
>
> IT IS FURTHER ORDERED that Defendant[s], JOHN ZACHARY DELOREAN and Logan Manufacturing Company and each of them, be, and hereby is [sic], authorized to encumber any and all property described in the Order of Judge Leisure dated January 24, 1989, as amended, in order to (1) borrow from an unaffiliated lender the amount required to pay, and to pay, or effect payment to, the Trustee of DeLorean Motor Company of the amounts payable to him under the Stipulation and Order of Judge George E. Woods extending time for payment; (2) pay all points, loan fees or other lender's charges, not exceeding $1,000,000 in the aggregate, required by and payable to the lender that provides the money to be paid to the Trustee; and (3) renew, extend, increase or reborrow, to a maximum aggregate amount of $3,500,000, on the line of credit being provided by First Security Bank of Utah presently financing Logan's business. All funds provided for in clause (3) of this paragraph shall be subject in all respects to Judge Leisure's Order date January 24, 1989, as previously amended.
>
> Judge Leisure's Order dated January 24, 1989, as previously amended, shall remain in full force and effect except a expressly modified herein or by further Order of this Court.

(February 28, 1989 Order, pp. 1–2).

On March 22, 1989, Judge Suhrheinrich entered a "Clarification Order" which au-

thorized DeLorean to borrow funds from the Saike Group, Inc. and to grant Saike Group., Inc. a mortgage on his New Jersey estate in order to raise the funds necessary to pay off Trustee Allard. Further, on March 28, 1989, Judge Suhrheinrich signed a "Memorandum Opinion and Order" denying DeLorean's motion for reconsideration of the Court's previous finding that DeLorean had personally received service of process in the United Kingdom action. On March 30, 1989, Judge Suhrheinrich signed a "Memorandum Opinion and Order" denying DeLorean's motions to dismiss, and to vacate restraining order and order of attachment.

On April 4, 1989, DeLorean filed a Notice of Appeal of Judge Suhrheinrich's February 10, 1989 Order (extending temporary restraining order on consent of the parties), as well as his March 28, 1989 Memorandum Opinion and Order (denying motion to dismiss and to vacate restraining order and attachments) and his March 30, 1989 Memorandum Opinion and Order (denying motion for reconsideration). On the same day, DSQ filed its motion for summary judgment, arguing that no genuine issue of material fact remained which precluded this Court from granting DSQ a judgment enforcing the United Kingdom Judgment.

DeLorean responded to DSQ's motion for summary with his "Cross–Motion for Stay of Further Proceedings in this Action." In this Cross–Motion, DeLorean raised, for the first time ever, the possibility that he would take action in the English courts to vacate the default judgment that was entered against him in favor of DSQ on October 12, 1987. DeLorean raised several bases to support his Cross–Motion for Stay of Further Proceedings, including:

1. The Court should stay further proceedings until the Sixth Circuit Court of Appeals decides DeLorean's appeal. According to DeLorean, the Court of Appeals had before it the opportunity to decide: a) that the United Kingdom Court lacked personal jurisdiction over him, thus ultimately rendering the United Kingdom judgment unenforceable under New York CPLR Section 5304(a)(2) [3]; and b) that the United Kingdom judgment conflicts with the bankruptcy adversary settlement, thus rendering the judgment unenforceable under CPLR Section 5304(b)(5).

2. The Court should stay further proceedings, pursuant to CPLR Section 5306 [4] because

3. New York CPLR Section 5304 provides as follows:

Section 5304. Grounds for non-recognition.
(a) No recognition. A foreign country judgment is not conclusive if:
1. the judgment was rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law;
2. the foreign court did not have personal jurisdiction over the defendant.
(b) Other grounds for non-recognition. A foreign country judgment need not be recognized if:
1. the foreign court did not have jurisdiction over the subject matter;
2. the defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend;
3. the judgment was obtained by fraud;
4. the cause of action on which the judgment is based is repugnant to the public policy of this state;
5. the judgment conflicts with another final and conclusive judgment;
6. the proceeding in the foreign court was contrary to an agreement between the parties

under which the dispute in question was to be settled otherwise than by proceedings in that court; or
7. in the case of jurisdiction based only on personal service, the foreign country was a seriously inconvenient forum for the trial of the action.
New York CPLR Section 5304.

4. New York CPLR Section 5306 provides:

Section 5306. Stay in case of appeal.
If the defendant satisfies the court either that an appeal is pending or that he is entitled and intends to appeal from the foreign country judgment, the court may stay the proceedings until the appeal has been determined or until the expiration of a period of time sufficient to enable the defendant to prosecute the appeal.
New York CPLR Section 5306.
In the instant case, it does not appear that DeLorean's action to vacate the United Kingdom Judgment constitutes an "appeal." Section 5306 specifically contemplates only the type of "appeal" for which there is a specific period of time provided in which to take the appeal. Here, DeLorean's action in the United Kingdom

DeLorean is entitled and intends to apply to the London Court to vacate the default judgment, pursuant to Order 13 Rule 9 of the English Rules of the Supreme Court. DeLorean has retained British counsel and is preparing to make an application to the London Court, seeking an order to vacate the default judgment and the subsequent assessment of damages and to stay any proceedings in England to enforce the default judgment.

The instant action should be stayed pursuant to CPLR Section 5306, pending a hearing and the determination of the London Court. Pursuant to CPLR Article 53, if the judgment is vacated, it will not be entitled to recognition and enforcement by this Court. *Vacatur* of the London judgment would thus preclude any *res judicata* effect of the judgment.

(DeLorean's Memorandum of Law in Support of Cross–Motion for Stay of Further Proceedings and in Opposition to Motion for Summary Judgment, p. 5).

3. The Court should stay further proceedings to permit DeLorean additional time to take discovery on the issue of whether he was personally served with process in the English action, although Judge Suhrheinrich found on February 6–7, 1989 that DeLorean had in fact been served, and Judge Suhrheinrich denied DeLorean's Motion for Reconsideration and Rehearing on this very issue.

In addition to these grounds for staying further proceedings, DeLorean argued that issues of fact precluded granting summary judgment.

On May 10, 1989, without oral argument, Judge Suhrheinrich signed his Memorandum Opinion and Order, granting summary judgment to DSQ and granting DeLorean's motion to stay further proceedings only for the purposes of allowing the Sixth Circuit Court of Appeals to determine DeLorean's interlocutory appeal. In his Memorandum Opinion and Order, Judge Suhrheinrich specifically denied DeLorean's request for a stay of the instant proceedings pending his taking the appropriate action in the United Kingdom court to vacate the United Kingdom default judgment:

In the instant case, as noted by defendant, a determination by the Sixth Circuit either that (a) the London court did not properly exercise personal jurisdiction over DeLorean (see CPLR Section 5304(a)(2)) or (b) the London judgment conflicts with prior final and conclusive orders of the Court would result in termination of the instant action (see CPLR Section 5304(b)(5)). A reversal on either issue will effectuate an ultimate disposition and termination of the instant enforcement action. Thus, the Court finds that a stay of proceedings would be dilatory and wasteful. If the Court enters its order on the motion for summary judgment at this time, the parties may consolidate the orders on the expedited appeal. The Court will, however, stay the enforcement of that judgment until the Sixth Circuit has rendered its decision.

Defendant has also indicated that he intends to apply to the London court to vacate the default judgment, pursuant to Order 13 Rule 9 of the English Rules of the Supreme Court. Defendant states that he has retained British counsel and is preparing to make an application to the London court, seeking an order to vacate the default judgment and the subsequent assessment of damages and to stay any proceedings in England to enforce the default judgment. This matter is not before the Court, however, and the Court therefore declines to stay the proceedings on this ground.

Accordingly,

---

court is more a collateral attack on the judgment, for which there may, or may not, be any time limitations.

In this regard, the Court notes that DeLorean admitted in the United Kingdom High Court that he first received actual notice of the United Kingdom proceedings in February or March, 1988 (London High Court November 24, 1989 Opinion, p. 21), but he did not take any action in the United Kingdom court until July 10, 1989. (June 27, 1990 Transcript of proceedings before the Supreme Court of Judicature Court of Appeal (Civil Division), London, U.K., p. 4).

IT IS HEREBY ORDERED that plaintiff's motion for summary judgment is GRANTED.

IT IS FURTHER ORDERED that defendant's cross-motion for stay of further proceedings is GRANTED to the extent that enforcement of the judgment is stayed until further direction from the United States Court of Appeals for the Sixth Circuit.

Richard F. Suhrheinrich
United States District Judge

(May 10, 1989 Memorandum Opinion and Order, pp. 3–4).

In the same Memorandum Opinion and Order, Judge Suhrheinrich noted that his previous orders of February 7, February 10, March 27, and March 29, 1989 "held, *inter alia,* (a) the London Court had personal jurisdiction over DeLorean since service of process upon DeLorean was effective and (b) the United Kingdom default judgment did not conflict with the prior final and conclusive judgments of this Court."[5] (May 10, 1989 Memorandum Opinion and Order, p. 1). The Court then held that summary judgment was proper because all factual issues had already been resolved in DSQ's favor. (Memorandum Opinion and Order, p. 2).

Judge Suhrheinrich then entered a Judgment, dated May 19, 1989, and a subsequent Amended Judgment, dated May 23, 1989, recognizing the judgment of the High Court of Justice, Chancery Division, London, England, and granting DSQ a money judgment in the amount of $59,099,298.63.

On June 7, 1989, DeLorean filed his notice of appeal of Judge Suhrheinrich's May 10, 1989 Memorandum Opinion and Order and the May 23, 1989 Amended Judgment. The Sixth Circuit heard oral argument both on this appeal and on DeLorean's appeal of Judge Suhrheinrich's previous orders on August 18, 1989. The Court of Appeals rendered its opinion affirming Judge Suhrheinrich in all respects on December 4, 1989. *DeLorean, supra,* 891 F.2d, at 132. It does not appear anywhere within this opinion whether it was disclosed or considered at oral argument that DeLorean had filed an action in the United Kingdom court to set aside the default judgment, which he had done on July 10, 1989.

On November 24, 1989, Justice Peter Gibson of the London High Court rendered a decision setting aside the previous order of Justice Hoffman of the same court, which had previously authorized DSQ to serve DeLorean outside of the jurisdiction, pursuant to the English equivalent of a long-arm jurisdiction statute, Order 11 Rule 1(1)(c). Justice Gibson further set aside the subsequent orders that depended upon the initial order authorizing DSQ to serve DeLorean outside of the jurisdiction, including the default judgment and the assessment of damages.

Justice Gibson set forth two grounds for his decision. First, as a prerequisite to jurisdiction over DeLorean under the United Kingdom's long-arm provision, the underlying cause of action stated in the complaint, strictly construed, must be sustainable. In this case, the "tortious conspiracy" action stated in the complaint was no longer sustainable under current English law, unless it is pleaded that the "sole or predominant purpose of the conspirators in making their agreement and in carrying out the acts which cause the damage in respect of which the plaintiff sues is to injure the plaintiff's interests." (November 24, 1989 Opinion, p. 28)[6]. Because this

---

**5.** The court here referred to the orders of Judge Woods in the bankruptcy adversary proceeding between the bankruptcy trustee of Delorean Motor Company and DeLorean.

**6.** This proposition represents a significant change in English law which occurred *subsequent* to Justice Hoffman's initial order authorizing DSQ to serve DeLorean outside of the jurisdiction:

The decision of Hoffman J. was in accordance with what was then generally thought to be the law as to the tort of fraudulent conspiracy. However, on 14th February 1989 another division of this court held in the case of *Mettall and Rohstof A.G. v. Donaldson Lufkin & Jenrette Inc.* [1989] 3 WLR 563 that a claim in fraudulent conspiracy could not be maintained if the plaintiff could not assert· and establish that the sole or predominant purpose of the defendant conspirators in making and carrying out their conspiracy was to injure the plaintiffs, and not to fill the conspirators' own pockets. This court held—possibly

element was not clearly pleaded in DSQ's United Kingdom complaint, the order granting DSQ leave to serve DeLorean outside of the jurisdiction was fatally defective. (November 24, 1989 Opinion, p. 39).

Further, Justice Gibson held that DSQ had made material omissions of fact in first seeking leave from Justice Hoffman to serve DeLorean outside of the jurisdiction, which justified setting aside the order under English case law. According to Justice Gibson, DSQ should have revealed that the bankruptcy adversary proceeding was pending in the United States. If known to Justice Hoffman, leave might have been denied because DSQ may have had the potential to recover a substantial portion of its instant claim through DSQ's proof of claim in the bankruptcy case, and the United Kingdom default judgment might lead to the possibility of a double recovery. Further, the similarity between the defenses that DeLorean could present in the bankruptcy adversary proceeding and the United Kingdom action might have persuaded Justice Hoffman not to grant leave in the first instance. (November 24, 1989 Opinion, pp. 43–45).

Second, Justice Gibson held that DSQ should have fully disclosed to Justice Hoffman the availability of defenses that DeLorean could have claimed to the United Kingdom, as well as the weaknesses of DSQ's own case. (November 24, 1989 Opinion, pp. 45–46). In reaching this conclusion, Justice Gibson apparently reviewed "a mass of evidence given to the Public

Accounts Committee of the House of Commons between 1982 and 1984, when the Committee investigated the financial assistance given to DSQ, and to the Detroit court in the criminal proceedings against Mr. DeLorean in 1986, such evidence coming from persons independent of Mr. DeLorean." (Opinion, p. 46).

Justice Gibson concluded that "leave must be set aside. It follows that all subsequent orders made against Mr. DeLorean will fall away." (Opinion, p. 58). However, Justice Gibson also stayed the effect of his decision vacating the default judgment pending appeal to the United Kingdom Supreme Court of Judicature Court of Appeal (Civil Division). (Morganroth Affidavit, p. 3 (footnote)).

On December 4, 1989, the Sixth Circuit Court of Appeals rendered its decision affirming Judge Suhrheinrich's May 23, 1989 amended judgment, and of course giving final effect to the same.

On December 18, 1989, based upon Justice Gibson's November 24, 1989 decision setting aside the United Kingdom default judgment, DeLorean filed in the Sixth Circuit Court of Appeals a Petition for Rehearing. In the Petition, DeLorean specifically argued that the original United Kingdom judgment is not enforceable under New York law, specifically New York CPLR Section 5302, because the judgment was vacated by Justice Gibson. (Petition for Rehearing, pp. 6–9). DeLorean specifi-

---

felt constrained to hold—that that conclusion followed from the decision of the House of Lords in *Lonhro Limited v. Shell Petroleum Co. Ltd.* [1982] A.C. 173.

In the present case it is accepted by the plaintiffs that that [sic] the conclusion of this court in *Mettall & Rohstof*, whether right or wrong, binds us, as it bound Peter Gibson J. Therefore the leave to serve out, granted by Hoffman J. cannot be justified on the basis of fraudulent conspiracy which was put before him.

This court, in *Mettall v. Rohstof*, granted the plaintiffs in that case leave to appeal to the House of Lords, but no appeal was pursued, possibly because the case was settled. However, we understand that the same point will, as matters presently stand, come before the House of Lords in October of this year in

another case, *Lonrho v. Fayed,* in which this court was also bound by *Mettall v. Rohstof.* I would note, though it is irrelevant to the decision on the substantial points which we, being bound by *Mettall v. Rohstof,* have to consider, that there would be an obvious injustice to the plaintiffs if the present action stands dismissed against Mr. DeLorean because their favoured claim in fraudulent conspiracy against all four defendants cannot stand because of *Mettall v. Rohstof,* and then in a few months' time *Mettall v. Rohstof* is overruled by the House of Lords. On the facts, if Lotus, Colin Chapman and Mr. Bushell were parties to a fraudulent conspiracy, it is beyond a peradventure that Mr. DeLorean was also a party to that conspiracy.
(United Kingdom Court of Appeal June 27, 1990 Opinion, pp. 5–6).

cally requested, in his Petition, that the Court of Appeals:

(a)(i) vacate the district court's decisions and orders upholding DSQ's action to enforce the London Default Judgment, (ii) vacate the district court's *ex parte* injunction and attachment orders, (iii) dismiss the instant enforcement action, and (iv) direct DSQ to post a substantial bond; or, in the alternative,

(b)(i) stay further proceedings in this action and vacate the restraints pending determination of DSQ's appeal of the November 24, 1989 order of the London High Court vacating the London default judgment and dismissing the London Action against DeLorean, (ii) vacate the *ex parte* injunction and attachment orders, and (iii) direct DSQ to post a substantial bond.

(Petition for Rehearing, p. 2). The Petition further discloses that, before the Court of Appeals' December 4, 1989 opinion, DeLorean had Federal Expressed to the Clerk of the Sixth Circuit a copy of the November 24, 1989 decision of Justice Gibson. (Petition for Rehearing, p. 1).

On January 18, 1990, the Sixth Circuit Court of Appeals entered an Order denying DeLorean's Petition for Rehearing, stating as follows:

Before: KEITH and MARTIN, Circuit Judges; and JULIA S. GIBBONS, District Judge.*

ORDER

Upon consideration of the petition for rehearing filed herein by the appellant, *the Court concludes that the issues raised were fully considered upon the original submission and decision of this case.*

IT IS THEREFORE ORDERED that the petition for rehearing be and it hereby is denied.

* The Honorable Julia S. Gibbons, United States District Judge for the Western District of Tennessee, sitting by designation.

7. In his "Affirmation in Support of Motion for Order Vacating Attachments and Injunctions and Awarding DeLorean Damages for Wrongfully Obtained Provisional Remedies," dated January 10, 1990, DeLorean's attorney, Mayer Morganroth, disclosed that he had filed the Petition for Rehearing with the Sixth Circuit, but, as of January 10, 1990, the Sixth Circuit had not

*DSQ Property Co., Ltd. v. DeLorean,* 1989 WL 145378, 1990 U.S.App.LEXIS 571 (January 18, 1990) (emphasis added).

Based also upon Justice Gibson's November 24, 1989 decision setting aside the United Kingdom default judgment, DeLorean filed in this Court, on January 11, 1990, a second "Motion for Order to Vacate Injunctions and Attachments and Award Damages for Wrongfully Obtained Provisional Remedies." The basis for the motion was that the underlying United Kingdom judgment upon which this action is based had been vacated by the very United Kingdom court which granted the judgment in the first instance.[7]

Judge Suhrheinrich, on March 30, 1990, entered an Order denying DeLorean's Motion for Order to Vacate Injunctions and Attachments, etc. Judge Suhrheinrich's Order states, in pertinent part:

IT IS HEREBY ORDERED that the order of attachment and injunction issued by Judge Leisure, as continued and upheld by this Court in orders dated February 10 and 28, 1989 and March 27 and 29, 1989, shall remain in effect and any further action is STAYED until such time that DSQ's appeal of the decision of the High Court of Justice, Chancery Division, in London, England to vacate the United Kingdom judgment against DeLorean is decided by the English court of appeal.

IT IS FURTHER ORDERED that upon disposition of the appeal in the English action, the Court will address the parties' remaining contentions.

Richard F. Suhrheinrich
United States District Judge

On June 27, 1990, the United Kingdom Court of Appeal rendered a decision affirming Justice Gibson's decision vacating the

yet ruled. (Morganroth, January 10, 1990 Affidavit, Par. 12, p. 9). On January 31, 1990, the Sixth Circuit's January 18, 1990 slip opinion denying DeLorean's Petition for Rehearing was docketed with this Court. It must be assumed that Judge Suhrheinrich was cognizant of this fact when he decided DeLorean's Motion for Order to Vacate Injunctions and Attachments.

United Kingdom judgment. In affirming, the United Kingdom Court of Appeal rested its decision on the ground that DSQ's initial complaint failed to state a claim upon which relief could be granted, and, therefore, the order authorizing DSQ to serve DeLorean outside of the jurisdiction was invalid. Consequently, the Court of Appeal reasoned, Justice Gibson had properly set aside the default judgment. (Court of Appeal, June 27, 1990 Opinion, pp. 4–13).

However, the Court of Appeal declined to decide whether Justice Gibson was correct in deciding that DSQ's alleged "non-disclosures" constituted alternate grounds for setting aside the default judgment, although the court did indicate that DSQ's argument that the alleged non-disclosures did not constitute sufficient grounds to set aside the previous orders and default judgment had "great force." (Court of Appeal Opinion, p. 17).

The Court of Appeal granted leave to DSQ to appeal its decision to the House of Lords, and further stayed its order dismissing the appeal and continued the stay entered by Justice Gibson pending the hearing of the appeal to the House of Lords. (Court of Appeal Opinion, p. 30). However, the Court of Appeal specifically premised this relief to DSQ as follows:

> We grant leave to appeal, however, on the basis of undertakings to be given by the plaintiffs, firstly, to prosecute their appeal with all due diligence, and, secondly, to stipulate in the Michigan District Court to maintain the stay of execution of the judgment it has obtained against the fourth defendant [DeLorean] in the Michigan District Court.... and the third undertaking that we require is that the plaintiffs will consent to the release by the United States court to Mr. DeLorean's English solicitors of a reasonable sum to cover Mr. DeLorean's costs of the appeal to the House of Lords.

(Court of Appeal Opinion, p. 30).

Counsel for DSQ consented to these terms, and the Court of Appeal confirmed that the attorneys' fees to be released to DeLorean's English attorneys are those required to cover the costs of the appeal to the House of Lords only. (Court of Appeal Opinion, p. 31).

Thus, the case is now in a rather exceptional posture. This Court has rendered a final judgment in favor of DSQ and against DeLorean in the amount of $59 million, which is by now appealable no further. However, the underlying foreign judgment upon which it is based has been vacated by the very United Kingdom court which rendered it in the first instance.

### B. THE PRESENT MOTION

Following the United Kingdom Court of Appeal's decision in his favor, DeLorean filed with this Court the instant "Renewed Motion to Vacate Attachments and Injunctions and Award Damages for Wrongfully Obtained Provisional Remedies and Other Relief." In this Renewed Motion, DeLorean seeks an order from this Court vacating the injunctions and attachments continued by Judge Suhrheinrich in his March 10, 1990 Order and awarding DeLorean damages incurred by him as a result of the injunctions and attachments, on the theory that these orders were wrongfully obtained by DSQ in the New York federal district court in the first instance. Furthermore, in his reply brief filed with respect to the instant Renewed Motion, DeLorean requests that this Court set aside, pursuant to FED.R.CIV.P. 60(b)(5), Judge Suhrheinrich's May, 1989 Opinion and Order granting summary judgment to DSQ, and the Amended Judgment itself.

### II. DISCUSSION

In its response to DeLorean's Renewed Motion, DSQ argues—correctly, this Court believes—that the relief that DeLorean presently seeks is precisely that relief which DeLorean sought in the Sixth Circuit Court of Appeals, and was denied.

DeLorean now claims that the circumstances have changed significantly since the time Judge Suhrheinrich granted DSQ's Motion for Summary Judgment in May, 1989 and, indeed, since Judge Suhrheinrich, on March 30 of this year, denied DeLorean's initial Motion to Vacate Attachments

and Injunctions. DeLorean implicitly claims, too, that the circumstances have changed since the Court of Appeals filed its December 4, 1989 Opinion affirming Judge Suhrheinrich's previous orders, including his order granting summary judgment to DSQ and the corresponding judgment in favor of DSQ, and since the Court of Appeals on January 18, 1990 denied DeLorean's Petition for Rehearing.

These alleged changes in circumstances can be divided roughly into two categories: 1) those changes relating to the status of DeLorean's efforts in the United Kingdom to have the United Kingdom default judgment set aside; and 2) those changes in DeLorean's personal financial situation which allegedly necessitate this Court's granting equitable relief from the prejudgment injunctions and attachments. The Court will discuss, in turn, both the substance and the legal effect of both of these alleged changes in circumstances.

### A. THE ACTIONS IN THE UNITED KINGDOM COURTS

■ DeLorean points out that, since the time Judge Suhrheinrich granted summary judgment in favor of DSQ in May, 1989, he filed and ultimately won his action in the London High Court to vacate the United Kingdom default judgment upon which the present action is based. The opinion setting aside the default judgment was rendered by the High Court on November 24, 1989. While it is true that these events took place after Judge Suhrheinrich entered summary judgment in May, 1989, these events actually took place *before* the Court of Appeals rendered its principal opinion affirming Judge Suhrheinrich's judgment on December 4, 1989 and before the Court of Appeals denied DeLorean's Petition for Rehearing. As a matter of fact, DeLorean informed the Court of Appeals, by Mayer Morganroth's letter dated November 27, 1989, that the High Court had vacated the default judgment. Never-

theless, the Court of Appeals affirmed Judge Suhrheinrich's Judgment in favor of DSQ as well as his previous orders continuing the injunctions and attachments.

If there was any doubt that the Court of Appeals considered the effect of the High Court's November 24, 1989 decision, this doubt was fully dispelled by the Court of Appeals when it denied DeLorean's Petition for Rehearing. Indeed, the principal grounds asserted by DeLorean in support of his Petition for Rehearing is the fact that the High Court vacated the default judgment. (Petition for Rehearing, "Point I," pp. 6–9). The grounds asserted in the Petition for Rehearing are the very same grounds DeLorean now urges upon the Court in support of his argument that the May, 1989 judgment must be set aside under FED.R.CIV.P. 60(b)(5).

On January 18, 1990, the Court of Appeals denied DeLorean's Petition for Rehearing, stating quite explicitly: "Upon consideration of the petition for rehearing filed herein by the appellant, the Court concludes that the issues raised were fully considered upon the original submission and decision of this case."

This Court does not believe it should effectively overrule the decision rendered by the Court of Appeals in this very case. *Beverly Hills Enterprises v. N.L.R.B.*, 727 F.2d 591, 593 (6th Cir.1984). Accordingly, since the Court of Appeals has already determined that the November 24, 1989 decision rendered by the London High Court does not justify setting aside Judge Suhrheinrich's May, 1989 judgment, that judgment is final.[8]

Since the Sixth Circuit Court of Appeals' January 18, 1990 Order denying DeLorean's Petition for Rehearing—on June 27, 1990—the United Kingdom Court of Appeal has upheld Justice Gibson's November 24, 1989 decision. However, this event does not significantly alter the posture of the United Kingdom proceedings. At the

---

**8.** At oral argument, counsel for DeLorean urged: (1) that it was not clear from its decisions that the Sixth Circuit had considered the impact of the United Kingdom decisions vacating the underlying default judgment; and (2)

that, in any event, where equity required, this Court was free to disregard or countermand the Sixth Circuit's decisions. This Court rejects counsel's position for the reasons set forth herein.

time the Court of Appeals denied DeLorean's Petition for Rehearing, the Court of Appeals was advised that Justice Gibson's dismissal of the Default Judgment was stayed pending appeal to the United Kingdom Court of Appeal. (DeLorean's Petition for Rehearing, p. 1). As the United Kingdom's proceedings presently stand, the Court of Appeal's decision is stayed pending appeal to the House of Lords. Thus, there is no functional or conceptual legal difference between the posture of the United Kingdom proceedings at the time the Sixth Circuit Court of Appeals denied DeLorean's Petition for Rehearing on January 18, 1990 and now.

■ Even if this Court were free to disregard the mandate of the Sixth Circuit, it would not grant DeLorean's motion to set aside the default judgment under FED.R. CIV.P. 60(b)(5). Since DSQ's appeal of Justice Gibson's November 24, 1989 decision vacating the default judgment is still pending before the House of Lords, and the United Kingdom Court of Appeal has explicitly stayed the order vacating the default judgment pending the appeal, this Court is satisfied that the United Kingdom default judgment has not yet been "vacated" as a final matter for the purposes of Rule 60(b)(5).

■ The Court finds DeLorean's reliance on *Sierra Club v. U.S. Army Corps of Engineers*, 732 F.2d 253 (2d Cir.1984) and other similar cases unpersuasive. The court in *Sierra Club* authorized modification of a *permanent* injunction under Rule 60(b)(5) in the event circumstances change so as to make modification of the permanent injunctive decree equitable. *Id.*, at 257. Contrary to DeLorean's argument, however, this same analysis is not strictly applicable to *preliminary* injunctions:

> A district court's modification of an injunctive decree will not be disturbed on appeal, absent a showing that the court abused its discretion. The test of that discretion is measured by whether the requested modification effectuates or thwarts the purpose behind the injunc-

tion. Thus, when reviewing an order modifying a preliminary injunction we look to see whether or not the *status quo* is maintained by the modification; conversely, in the case of a final or permanent injunction, the inquiry on appeal is whether there has been such a change in the circumstances as to make modification of the decree equitable.

*Id.* (citation omitted).

In the instant case, DeLorean requests that the Court vacate the injunctions and attachments. Clearly, such action is not warranted even by the *Sierra Club* case, since the injunctions and attachments here are necessary to preserve the *status quo* pending the House of Lords' determination of DSQ's appeal. Further, even if the Court were to analyze the injunctions and attachments as if they were permanent injunctive relief, *Sierra Club* would not authorize the relief requested by DeLorean here because there has been no significant change in the circumstances since the Sixth Circuit Court of Appeals last addressed these issues.

## B. CHANGES RELATING TO DeLOREAN'S FINANCIAL CONDITION

■ DeLorean further argues that significant changes have occurred with regard to his personal financial situation sufficient to justify this Court's setting aside the prejudgment injunctions and attachments. Principally, DeLorean argues:

1. Logan Manufacturing Company has been unable, because of the existing restraints, to obtain financing sufficient to carry on its business, and has, in fact, closed down and laid off its employees.

2. The Saike Group, the lender which holds a mortgage on DeLorean's 440–acre New Jersey estate, has filed foreclosure proceedings because the previous order which permitted the mortgage [9] did not permit any renewal of the loan, and also because the lender is otherwise "wary of continuing the loan already in default." According to DeLorean, he will lose all right, title and interest to the New Jersey estate within 90 days, although scant detail

---

9. DeLorean here refers here to Judge Suhrhein- rich's March 22, 1989.

is provided here with respect to when the foreclosure proceedings were commenced, whether the foreclosure is a foreclosure by advertisement or a judicial foreclosure, whether judgment has been entered, or what the applicable redemption period is in New Jersey.

3. On May 8, 1990, Logan Manufacturing Company was able to arrange for a $12 million refinancing loan from "Lakevue Funding, Inc." sufficient to reopen Logan's manufacturing facility. The $12 million loan was to be secured by a first mortgage on the New Jersey estate. DeLorean states that DSQ wrongfully "refused to permit or stipulate to said financing." (DSQ refused to allow DeLorean to put up the New Jersey estate as collateral for the loan).

In its response, DSQ alleges that Logan Manufacturing is indeed open for business despite DeLorean's representations to the contrary. In support of this proposition, DSQ submitted the affidavit of a private investigator (with accompanying 8″ × 10″ glossy color photographs) stating that he visited the plant subsequent to the filing of the instant Renewed Motion, and found that there were many employees there working what appeared to be normal shifts. At any rate, DSQ argues that Logan's financial difficulties stem from DeLorean's alleged violation of the covenants in the loan agreement between Logan Manufacturing Company and its financing bank and from a general downturn in the ski equipment business, rather than from the existing restraints.

With regard to DSQ's wrongfully squelching the Lakevue Funding refinancing transaction, DSQ represents that it attempted to negotiate with DeLorean with regard to the terms of the refinancing, but DSQ was simply unwilling to allow DeLorean to encumber the New Jersey estate in the full amount of $12 million, thus endangering the value of one of the principal assets available to satisfy DSQ's judgment. DSQ further questions whether Lakevue Funding is a bona fide lender, even going so far as to imply that DSQ unsuccessfully attempted to verify Lakevue Funding's existence with the applicable New Jersey licensing authorities.

Upon reviewing the affidavits and other exhibits on file herein, it appears to the Court that the only substantial change in circumstances that has occurred with respect to DeLorean's financial situation since the time Judge Suhrheinrich denied DeLorean's last attempt to vacate the injunctions and attachments is the New Jersey foreclosure proceedings. It is clear that the imminent shutdown of Logan Manufacturing Company's business was squarely put to Judge Suhrheinrich at the time he last denied DeLorean's motion to set aside the injunctions and attachments. Further, DSQ's refusal to allow DeLorean to put up his $12 million equity in the New Jersey estate to invest the same in Logan Manufacturing hardly constitutes sufficient cause to allow DeLorean unrestricted use of his assets.

With regard to the New Jersey foreclosure, DeLorean has not provided any details as to how soon the foreclosure proceedings will proceed to the point where DeLorean will suffer irreparable harm. Moreover, DeLorean has failed to propose any concrete modification of the existing restraints that would enable him to save the New Jersey estate on an interim basis, short of granting him unrestricted access to all assets.

The Court does not believe that it would be equitable at this stage of the proceedings to allow DeLorean unrestricted access to all of his assets in order to save the New Jersey estate from foreclosure absent some specific proposal detailing how he would use those assets.

More importantly, however, the Court finds that the Court of Appeals' decisions upholding the validity of Judge Suhrheinrich's May, 1989 judgment preclude it from releasing DeLorean's assets. Absent some grounds for setting aside that judgment—other than the grounds that were argued to the Sixth Circuit Court of Appeals—the Court finds that Judge Suhrheinrich's May, 1989 Order is final, and further proceedings in this Court should proceed on that assumption.

Having rendered this decision, the Court notes that it has clearly indicated to the parties at the August 8, 1990 hearing its concern that every possible action be taken to preserve the value of the assets subject to the injunction pending final resolution of the case. If these assets are severely diminished or depreciated in value before the final resolution of the case, then the ultimate "victory" by *either* party would be pyrrhic indeed. The Court believes it must take whatever action it can to prevent this result.

One last issue needs to be addressed. In its June 27, 1990 Opinion, the United Kingdom Court of Appeal conditioned its order granting DSQ leave to appeal to the House of Lords upon DSQ's agreement to submit to a stay of the execution of its May, 1989 judgment. As this Court does not wish in any way to delay or obstruct the appeal process in the United Kingdom, it will further stay DSQ's execution of the May, 1989 judgment pending the final determination of the United Kingdom action.

III. ORDER

For all of the reasons cited herein, and the Court being otherwise fully advised in the premises;

NOW, THEREFORE;

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Defendant's Renewed Motion to Vacate Attachments and Injunctions and Award Damages for Wrongfully Obtained Provisional Remedies and Other Relief shall be and hereby is DENIED.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, for the reasons stated by the Court on the record at the August 8, 1990 hearing, that the Defendant's motion to require DSQ to post a substantial bond is DENIED.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that DSQ's execution upon the Court's May, 1989 Amended Judgment shall be and hereby is STAYED pending further order of this Court.